David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
P. Camille Guerra, SBN 326546
*camille@cglaw.com*
Howard D. Bruno, SBN 348304
*camille@cglaw.com*
**CASEY GERRY SCHENK FRANCAVILLA**
 **BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANALI HERRERIAS; MARIAH NAYERI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiffs, <br><br> V. <br><br> APPLE INC., <br><br> Defendant. | CASE NO. <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

## I. **NATURE OF ACTION**

1. Anyone that has ever owned an iPhone or similar Apple device knows all to well how tightly Apple controls access to the device and its universe of apps, programs, operating systems, and other features of its ecosystem. This is not something that happened by chance. Instead, Apple is illegally monopolizing the smartphone market by locking consumers into its products and preventing competition.

2. Through various anti-competitive and exclusionary practices, Apple has built a walled-off iPhone ecosystem that has made Apple fantastically profitable. Indeed, thanks to Apple's monopolistic practices, the U.S. is the world's third-biggest smartphone market after China and India, but also by far its least competitive. And Apple has roughly 70% of that U.S. market.

3. Apple's specific practices are detailed more below, but the main anti-competitive behavior can be summarized like this:

- Apple stifles competition through contractual restrictions, fees and taxes on app creation and distribution.

- Apple controls cloud streaming apps such as Spotify, Netflix and Google Photos.

- Apple limits "super apps" that perform many daily functions including social media, payments, banking, and video messaging.

- Apple uses APIs and other critical access points in the smartphone ecosystem to control the behavior and innovation of third parties to insulate itself from competition.

- Apple maintains its control in part through messaging apps, especially iMessage.

- Apple tightly controls how smartwatches operate on its platform and limits competitors' capabilities on iOS.

- Apple restricts cross-platform wallets on the iPhone, which impedes innovation and competition.

4.      Apple knew (and still knows) that disruptive technologies and innovative apps, products, and services threaten its dominance by making users less reliant on the iPhone or making it easier to switch to a non-Apple smartphone. But instead of responding to competitive threats by lowering smartphone prices or allowing better monetization for developers, Apple met competitive threats by imposing a series of byzantine rules and restrictions in its App Store guidelines and developer agreements that allow Apple to extract higher fees, thwart innovation, offer a lesser user experience, and throttle competitive alternatives. And it has done this across many technologies, products, and services, including super apps, text messaging, smartwatches, and digital wallets, among many others.

5.      By way of quick background, Apple introduced the iPhone in January 2007, and it quickly became "a game changer for the industry." In July 2008, Apple launched the App Store. In January 2010, Apple released the iPad and in June 2010, Apple released the iPhone 4, which introduced FaceTime, multitasking, and other apps.

6.      In August 2018, Apple became the first publicly traded U.S. company to be valued at over $1 trillion. In August 2020, it was valued at $2 trillion, at $3 trillion in January 2022, and at just over $3 trillion in August 2023.

7.      Apple owes a substantial portion of its success to its closed-system ecosphere. Apple deters competition by designing iPhones to block cross-platform technologies between iPhones and Android smartphones to solidify, establish, and increase Apple's smartphone monopoly. Apple has blocked features and innovation on its iPhone, which makes the iPhone worse for consumers and prevents competition. This, in turn, unlawfully inflates the price of the iPhone. While Apple claims that it engages in this kind of anti-competitive

conduct because of "security" and "privacy" interests, this is false. Rather, Apple does this to deter competition in the smartphone markets. Allowing it to get supra-competitive profits on the iPhone.

8.     As a result of these barriers, Apple makes Android smartphones effectively less functional and less attractive to consumers, resulting in monopoly rents and supra-competitive pricing on the iPhone.

9.     Apple's anticompetitive conduct not only limits competition in the smartphone market, but also reverberates through the industries that are affected by these restrictions, including financial services, fitness, gaming, social media, news media, entertainment, and more.

10.     For example, because of these cross-platform barriers, Apple dominates the smart watch market and charges supra-competitive prices for the Apple Watch.

11.     U.S. consumers have accepted Apple's behavior for a long time, but no more. The Plaintiffs ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" as defined below), on personal knowledge as to the facts pertaining to them and on information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and California unfair competition laws. Plaintiffs demand a trial by jury and allege as follows.

## II.     JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

12.     Plaintiffs bring this action under Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26) for treble damages, injunctive relief, other relief, and reasonable attorneys' fees and costs for the injuries sustained by Plaintiffs arising from violations by Defendant of the federal antitrust laws, including Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2).

13.     This Court has subject matter jurisdiction over this action pursuant to Sections 1331, 1337(a) and 1367 of Title 28 of the United States Code (28 U.S.C. §§ 1331, 1337(a) and 1367).

14.     This Court has personal jurisdiction over Apple because it: (a) is headquartered in this District; (b) transacts business in the United States, including in this District; (c) is registered to do business in the state of California; (d) has substantial aggregate contacts with the United States, including this District; and (e) engaged in and engages in anticompetitive acts that were and are directed at, and had and have a direct, substantial, and reasonably foreseeable and intended effect of injuring the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District; (f) the anticompetitive designs, testing and implementation of the iPhone originated in this District.

15.     Venue is proper in this District under Sections 15 and 22 of Title 15 of the United States Code (15 U.S.C. §§ 15 and 22) and Sections 1391(b) and (c) of Title 28 of the United States Code (28 U.S.C. § 1391(b) and (c)) because Apple's principal place of business is in this District and a substantial part of events and omissions giving rise to the claims occurred in this District. Venue is also proper in this Court because Apple is located here and the causes of action arose here.

16.     Pursuant to the Northern District of California's Civil Local Rule 3-2(c) & (e), the intradistrict assignment should be to the San Jose Division. This action arises in Santa Clara County because Apple is headquartered in Cupertino CA, and a substantial part of the events giving rise to these claims occurred in Santa Clara County, California.

## III.   PARTIES

17.     Plaintiff Anali Herrerias is an individual and purchased and paid for an Apple iPhone 15. Plaintiff is a resident of San Diego, California.

4

18.     Plaintiff Mariah Nayeri is an individual and purchased and paid for an Apple iPhone 15 Pro Max and an Apple Watch Series 6. Plaintiff is a resident of San Diego, California.

19.     Apple Inc. ("Apple") is a corporation that was created under the laws of the State of California, and has its principal place of business in Cupertino, California. Apple is the world's largest information technology company by revenue, and the world's third-largest mobile phone developer. There are currently over one billion Apple products in active use worldwide.

## IV.   FACTUAL ALLEGATIONS

### A.   Apple, Inc.

20.     Apple is a global technology company with headquarters in Cupertino, California. Apple is one of the world's most valuable public companies with a market capitalization over $2.5 trillion. In fiscal year 2023, Apple generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

21.     Apple started off in 1976 making personal computers. Even then, Apple had a knack for expensive, high-end designs and niche marketing relative to its competitors. But it struggled to compete against rivals that offered lower prices and more programs. Apple's quirky computer designs consistently lost out to Windows-based PCs, and by the late 1990s, it was on the brink of bankruptcy.

22.     But Apple's fortunes changed around the time it launched the iPod in 2001. The iPod gave Apple a recipe for the future: a high-end device, many platform participants, and a digital storefront. More importantly, it gave Apple a playbook: drive as many consumers and third-party participants to the platform as possible and offer a wide selection of content, products, and services created by those third parties to consumers. This structure put Apple in the driver's seat

to generate substantial revenues through device sales and the ancillary fees it gets from sitting between consumers and the products and services they want.

23.    Apple's experience with the iPod set the stage for Apple's most successful product yet. In 2007, Apple launched the iPhone, a smartphone that offered high-end hardware and software applications, called "apps," built on a mobile operating system that mimicked using a computer. At first, Apple offered only a small number of apps for the iPhone, but it quickly realized the enormous value that a broader community of developers could bring to the iPhone platform. So, Apple invited these third parties to develop new apps while maintaining control and monetizing that work for itself. This served an important purpose for Apple, helping to "further lock customers into [Apple's] ecosystem" and "make Apple['s] ecosystem even more sticky."

24.    The iPhone is now—and has been for some time—the primary driver of Apple's growth and profitability, routinely commanding profit margins of more than 30 percent.

25.    Apple also extracts revenue from iPhone users beyond the initial smartphone sale. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services such as Apple's streaming subscriptions for music, TV, games, news, fitness, and cloud storage, iPhone accessories, and more. Some of the largest drivers of revenue in this field are Apple's smartwatch, the Apple Watch, and Apple's App Store. In recent years, these ancillary products and services, all of which are accessed primarily through the iPhone, have accounted for an increasing share of Apple's revenues.

26.    Calculated by revenue, Apple's U.S. market share is over 70 percent in the "performance smartphone market"—a more expensive segment of the broader smartphone market where Apple primarily competes—and over 65 percent for all smartphones. These market shares have remained remarkably durable over the last decade. Apple's smartphone market shares understate

CLASS ACTION COMPLAINT

Apple's dominance and likely growth in key demographics, including among younger Americans. For example, one third of all iPhone users in the United States were born after 1996, as compared to just 10 percent for Samsung, Apple's biggest smartphone competitor. And because smartphone users often use just one smartphone to access related products and services, locking up key user groups allows Apple to capture greater spending on iPhone-related products and services, realize higher margins per user, and exercise greater control over developers.

## 1.  Apple takes advantage of *United States v. Microsoft*.

27.     Ironically enough, the antitrust case of *United States v. Microsoft* allowed for innovation in areas that would be essential to Apple's success. For example, the iPod did not achieve widespread adoption until Apple developed a cross-platform version of the iPod and iTunes for Microsoft's Windows operating system, a development made possible by the Microsoft antitrust case. Following that consent decree in the Microsoft case, Apple launched a cross-platform version of iTunes that was compatible with the Windows operating system. As a result, a much larger group of users could finally use the iPod and iTunes, including the iTunes Store.

28.     The pervasiveness of iPod and iTunes on Windows directly contributed to the development and success of the iPhone. But after launching the product, Apple followed the Microsoft playbook and began stifling the development of cross-platform technologies on the iPhone, just as Microsoft tried to stifle cross-platform technologies on Windows.

29.     In January 2007, Apple debuted the first-generation iPhone, describing the device as "an iPod, a phone, and an internet communicator," and touting the fact that users could "sync[] content from a user's iTunes library on their PC or Mac." Apple marketed the iPhone as a smartphone that was easy to use. Reflecting on the company's learning from the iPod, Apple's then-CEO

announced, "iTunes is going to sync all your media to your iPhone—but also a ton of data. Contacts, calendars, photos, notes, bookmarks, email accounts."

30.     The original iPhone cost approximately $299—approximately $450 in 2024 dollars adjusted for inflation—with a two-year contract with a phone carrier.

31.      Soon after launching the iPhone, Apple invited third-party developers to create apps for it. Apple released its first software development kit to encourage third-party developers to create their own apps for the iPhone. Apple also provided financial incentives to developers by allowing them to selling apps and later in-app purchases and subscriptions. By 2009, Apple was running marketing campaigns highlighting the value that third-party apps provide to iPhone users with the now-famous slogan: "There's an app for that."

32.     Apple's decision to invite third-party developers on its iPhone platform ultimately generated billions of dollars for Apple and helped establish an iPhone user base of more than 250 million devices in the United States. Indeed, Apple's market shares—over 70 percent of the "performance smartphone market" and over 65 percent of the "smartphone market" likely understate its monopoly power today.

33.     But there is a downside to Apple as well. While Apple third-party developers that increase the iPhone's value to users, third-party products and services can also disrupt Apple's smartphone monopoly by decreasing users' dependence on Apple and the iPhone and increasing competitive pressure. As a result, Apple chooses to sacrifice the benefits it would gain from improved products and services developed by third parties when necessary to maintain its monopoly.

### 2.  Apple imposes tight controls on app creation and app distribution.

34.     Apple controls how developers distribute and create apps for iPhone users. For example, developers can only distribute iPhone apps through Apple's

CLASS ACTION COMPLAINT

App Store, which is the only way for users to download native iOS apps. Limiting distribution to the Apple App Store enables Apple to exert monopoly power by imposing contractual restrictions that limit the behavior of non-Apple apps and services. Apple sets the conditions for apps it allows on the Apple App Store through its App Store Review Guidelines.

35.     Apple also controls app innovation by deciding which Application programming Interfaces ("APIs") are available to developers when they make third-party apps. For example, developers cannot provide apps on the iPhone unless they enter into Apple's non-negotiable Developer Program License Agreement ("DPLA"). That agreement requires developers to use public APIs only in the manner prescribed by Apple. It also prohibits third-party apps from using anything Apple designates as "private." And Apple selectively designates APIs as public or private to benefit itself, limiting the functionality developers can offer to iPhone users even when the same functionality is available in Apple's own apps, or even select third-party apps. Further, Apple uses its DPLA to penalize developers that take advantage of technologies that threaten to disrupt or erode Apple's monopoly power.

36.     Apple's control over both app distribution and creation gives Apple tremendous power, along with the ability to extract supra-competitive profits from iPhone sales. For example, Apple designates as private the ability to send Short Message Service ("SMS") text messages, the ubiquitous a protocol used by mobile carriers since the early 1990s to allow users to send basic text messages from one mobile number to another. Because of Apple's designation, Developers have no technical means to access these private APIs, and even if they did, doing so would breach their developer agreement with Apple, and thus put the developer at risk of being blocked by Apple from distributing apps through the App Store. Likewise, Apple can control the functionality of third-party apps and accessories through its control of app distribution because if an app includes

functionality that Apple does not like, Apple can and does block the app from the App Store.

37. Apple's dominance is such that neither app developers nor iPhone users can benefit from lower cost or higher quality means of distributing apps or purchasing and providing digital products and services. Apple guarantees that it continues to benefit from the contributions of third-party developers and other platform participants while also protecting itself from the competitive threats and those participants pose to Apple's smartphone monopoly.

38. This complaint concerns Apple's use of its dominance to impose contracts and that restrict the behavior and design decisions of companies other than Apple.

### 3. Apple benefited from Third-Party Creativity on Smartphones, which are Platforms.

39. As the smartphone market has evolved, it started to replace use of personal computers. Smartphones combine the functionality of a traditional mobile phone with advanced hardware and software components. This cluster of services and features results in a distinct product for consumers and developers. Smartphones not only are used to make phone calls, but also allow users to text others, to take photos, browse the internet, complete financial transactions, listen to music, and engage in other activities.

40. Smartphones are also platforms, which bring together different groups that benefit from each other's participation on the platform. For example, a food delivery app brings together restaurants, couriers, and consumers.

41. The technology and economics of a smartphone platform are fundamentally different from the technology and economics of a simultaneous transaction platform, such as a credit card, because smartphone platforms compete over device features and pricing in ways that do not directly relate to app store transactions. Whereas credit card transactions reflect a single

CLASS ACTION COMPLAINT

simultaneous action that requires both sides of the transaction for either side to exist, consumers value smartphone platforms for reasons separate from their ability to conduct a simultaneous transaction. Consumers care about non-transactional components of the phone, such as its camera and processing speed, and they care about non-transactional components of apps, such as their features and functionality.

42.    The economics of a smartphone platform are such that the platform's value to users—and in turn to the platform operator—increase when new apps and new features are added to the platform. To create these economic benefits for itself and its users, Apple has opened its smartphone platform to third-party developers, whose countless inventions and innovations have created enormous value. Apple has willingly opened the platform to third-party developers to capture this value even though there is no extensive regulatory framework requiring it to do so or overseeing how it interacts with those third parties. In this way, smartphone platforms are very different from other platforms, like landline telephone networks, whose value-adding features were built primarily by the platform operator and which were only opened to third parties when the platform operator was required to do so by regulation. When a third-party developer for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the economic value of the iPhone to Apple. This has played out hundreds of thousands of times for the iPhone, resulting in an enormously valuable smartphone platform reflecting the combined contributions of millions of developers.

43.    The technology and economics of a smartphone platform are fundamentally different from those of a simultaneous transaction platform (such a credit card) because smartphone platforms compete over device features and pricing in ways that do not directly relate solely to app store transactions. Consumers value smartphone platforms for many reasons unrelated to their

ability to facilitate a simultaneous transaction. Consumers care more about the "non-transaction" components of the phone, such as its camera and processing speed, and they care about non-transactional components of apps, such as their features and functionality.

44.     Additionally, a smartphone's platform value to users increases when new apps and new features are added to the platform. To create these economic benefits for itself and its users, Apple opened its smartphone platform to third-party developers, whose countless innovations have created enormous value for Apple. This is because when a third-party for the iPhone creates a valuable new feature, consumers benefit and consumer demand goes up for Apple's products, increasing the value of the iPhone to Apple.

45.     On the flip side, limiting the features and functionality created by third-party developers makes the iPhone worse and deprives Apple of the economic value it would gain as the platform operator. It makes no economic sense for Apple to sacrifice the profits it would earn from new features and functionality unless it has some compelling reason to do, such as protecting monopoly profits.

**B.     Apple Acquires and Maintains a Monopoly in the "Smartphone" and "Performance Smartphone" Markets.**

**1.   Apple harms competition by imposing contractual restrictions, fees, and taxes on Super App creation and distribution.**

46.     As alleged by a governmental investigation, Apple's internal documents indicate that soon after the iPhone was introduced, Apple became concerned that third party interference on its platform would detract from Apples's profits from iPhone sales and related revenue streams. So, Apple took a variety of anti-competitive actions to suppress competition in that arena.

47.     Apple exercises its control over app distribution and app creation to dictate how developers create for the iPhone. It enforces rules and contractual

restrictions that stop or delay developers from innovating in ways that threaten Apple's power. In so doing, Apple influences the direction of innovation both on the iPhone and on Apple's competitors in the smartphone markets. In particular, Apple steers iPhone users away from products that compete with Apple by increasing the cost and friction of switching from the iPhone to another smartphone.

48.    The barriers Apple installs to cross-platform technologies also makes its competitors' products function more poorly. This compels Android smartphone users to move to purchasing iPhones, in turn allowing Apple to charge supercompetitive prices for iPhones, and harming Plaintiffs and Class Members by limiting consumer choice.

49.    Apple's monopoly maintenance has taken many forms and continues to evolve today; however, Apple's anticompetitive and exclusionary course of conduct is best exemplified by its contractual rules and restrictions targeting several products and services: super apps, messaging apps, smartwatches and digital wallets. By stifling these technologies, Apple reinforces its "moat" around its smartphone monopoly by discouraging innovation that threatens Apple's smartphone monopoly or the use of a more open system for the iPhone. Apple continues to expand the scope of its anticompetitive conduct such that the sum is greater than the parts, and Apple's conduct is even more powerful than that of each of its exclusionary acts alone.

50.    Apple prevented apps from threatening its smartphone monopoly by undermining mini programs that reduce user dependence on the iPhone.

### i.    Apple Stopped "Super Apps" from Threatening its Monopolies.

51.    A "super app" is an app that can serve as a platform for smaller "mini" programs. It provides a wide variety of services that typically go beyond what a traditional app does. Super apps can create significant user "stickiness" by

having users engage with the app for many different reasons and for longer. They also offer a new revenue stream for companies looking to expand their offerings and reach new customers. Examples include WeChat and Gojek, which are popular outside of the US.

52. Super apps are currently popular in Asia, Africa and Central America but haven't been adopted in North America (likely because of Apple's restrictions). Super apps are generally popular with users because of the service integration and cost-effectiveness they provide.

53. Super apps are written in programming languages that allow them to function across different platforms, meaning that they can work the same on any web browser or device. This allows developers to write a single mini program that will work whether users have an iPhone or another smartphone.

54. Companies and investors started to realize that creating a platform that brings multiple services, such as ride-hailing, mobile payments, food delivery, and more into one app, can potentially increase user engagement and retention, creating more revenue opportunities.

55. Unfortunately for Apple, though, super apps also reduce user dependence on the iPhone. This is because a super app is its own kind of middleware that can host apps, services, and experiences without requiring developers to use the iPhone's APIs or code.

56. As users interact with a super app, they rely less on the smartphone's proprietary software and more on the app itself. In this way, users become more willing to choose a different smartphone because they can access the same interfaces, apps, and content on any smartphone where the super app is also present. Moreover, developers can write the mini programs gross platforms. This lowers barriers to entry for smartphone rivals and decreases Apple's control over third-party developers and reduces switching costs.

57.     Apple recognizes that super apps with mini programs would threaten its monopoly. As one Apple manager reportedly put it, "allowing super apps to become the main gateway where people play games, book a car, make payments, etc. would let the barbarians in at the gate?" Because when a super app offers popular mini programs, stickiness goes down.

58.     Apple's fear of super apps is based on first-hand experience with the enormously popular super apps in Asia, such as WeChat. Apple does not want U.S. companies and U.S. users to benefit from similar innovations. For example, in a Board of Directors presentation, Apple reportedly highlighted the "[u]ndifferentiated user experience on [a] super platform as a major headwind to growing iPhone sales in countries with popular super apps due to the [l] ow stickiness and [l]ow switching cost." For the same reasons, a super app created by a U.S. company would pose a similar threat to Apple's smartphone dominance in the United States. Apple reportedly noted as a risk in 2017 that a potential super app created by a specific U.S. company would "replace[] usage of native OS and apps resulting in commoditization of smartphone hardware."

59.     So, super apps aren't available on the iPhone platform. Apple created, strategically expanded, and aggressively enforced its App Store Guidelines to effectively block apps from hosting mini programs. Apple's conduct disincentivized investments in mini program development and caused U.S. companies to abandon or limit support for the technology in the United States.

### ii.     Cloud Streaming Apps: Apple stopped developers from offering cloud gaming apps and services.

60.     For years, Apple blocked cloud gaming apps that would have given users access to desirable apps and content without needing to pay for expensive Apple hardware because this would threaten its monopoly power.

61.     Cloud streaming apps let users run a computationally intensive program without having to store the program on the smartphone itself. Instead, a

user's smartphone leverages the computing power of a remote server, which runs the program and streams the result back to the phone. Cloud streaming allows developers to bring cutting-edge technologies and services to smartphone consumers—including gaming and interactive artificial intelligence services— even if their smartphone includes hardware that is less powerful than an iPhone.

62.     Cloud streaming has significant benefits for users. For example, Apple has promoted the iPhone 15 by promising that its hardware is powerful enough to enable "next-level performance and mobile gaming." But powerful hardware is unnecessary if games are played via cloud streaming apps. For a cloud game, the user experiences and plays the game on the smartphone, but the game is run by hardware and software in remote computing centers ("the cloud"). Thus, cloud gaming apps deliver high-end gaming experiences on smartphones without the need for users to purchase powerful, expensive hardware. Thus, users with access to cloud streamed games may be more willing to switch from an iPhone to a cheaper smartphone because both smartphones can run desirable games equally well.

63.     Cloud streaming also has significant advantages for developers. For example, instead of re-writing the same game for multiple operating systems, cloud platforms allow developers to create a single app that works across iOS, Android, and other operating systems. Cloud streaming provides more and simpler options for offering subscriptions, collecting payments, and distributing software updates as well. All of this helps game developers reach economies of scale and profitability they might not achieve without offering cloud gaming apps and reduces their dependence on iOS and Apple's App Store.

64.     Apple wielded its power over app distribution to effectively prevent third-party developers from offering cloud subscription services as a native app on the iPhone. Even today, none are currently available on the iPhone. Apple has imposed the onerous requirement that any cloud streaming game—or any update

to a cloud streaming game—be submitted as a stand-alone app for approval by Apple. Having to submit individual cloud streaming games for review by Apple increases the cost of releasing games on the iPhone and limits the number of games a developer could make available to iPhone users. For example, the highest quality games, referred to as AAA games, typically require daily or even hourly updates across different platforms. If these updates need to be individually approved by Apple, developers must either delay their software updates across all platforms or only update their games on non-iOS platforms, potentially making the iOS version of the game incompatible with other versions on other platforms until Apple approves the update. Neither option is tenable for players or developers.

65.    Until recently, Apple would have required users to download cloud streaming software separately for each individual game, install identical app updates for each game individually, and make repeated trips to Apple's App Store to find and download games. Apple's conduct made cloud streaming apps so unattractive to users that no developer designed one for the iPhone.

66.    Apple undermines cloud gaming apps in other ways too, such as by requiring cloud games to use Apple's proprietary payment system and requiring game overhauls and payment redesigns specifically for the iPhone. Apple's rules and restrictions effectively force developers to create a separate iOS-specific version of their app instead of creating a single cloud-based version that is compatible with several operating systems, including iOS. As a result, developers expend considerable time and resources re-engineering apps to bring cross-platform apps like multiplayer games to the iPhone.

67.    Cloud streaming apps broadly speaking—not just gaming—could force Apple to compete more vigorously against rivals. It has been reported that, as one Apple manager recognized, cloud streaming eliminates "a big reason for high-performance local compute" and thus eliminates one of the iPhone's

advantages over other smartphones because then "all that matters is who has the cheapest hardware." Accordingly, it reduces the need for users to buy expensive phones with advanced hardware. This problem does not stop at high-end gaming but applies to several high-compute requirement applications.

### 2. Apple uses Messaging to control the behavior and innovation of third parties in order to insulate itself from competition.

68.    In 2022, Apple's CEO Tim Cook was reportedly asked whether Apple would fix iPhone-to Android messaging. "It's tough," the questioner implored Mr. Cook, "not to make it personal but I can't send my mom certain videos." Mr. Cook's response? "Buy your mom an iPhone."

69.    Messaging apps allow smartphone users to communicate with friends, family, and other contacts. Smartphone messaging apps use "protocols" which are the systems that enable communications and determine the features available when users interact with each other via messaging apps.

70.    One important protocol used by messaging apps is SMS. SMS offers a broad user network, but limited functionality. For example, all mobile phones can receive SMS messages, meaning it is possible to message between iPhones and Android phones. But SMS does not support modern and desired messaging features, such as being able to send large files like videos, edited messages, or reactions like a "thumbs up" or a heart.

71.    Many messaging apps use proprietary, internet-based protocols, which are sometimes called OTT ("over the top") protocols. OTT messaging usually used more secure and advanced features, such as the ability to share rich media, typing indicators and encryption. OTT only works between users to sign up and communicate through the same messaging app.

72.    Apple doesn't allow third party developers to access the APIs needed to implement SMS. As a result, third party messaging apps cannot combine the "text to anyone" functionality of SMS with the advanced features of OTT

messaging. Instead, if a user wants to send a message in a third-party messaging app, they must first confirm whether the person they want to talk to has the same messaging app and, if not, convince that person to download and use a new messaging app. By contrast, if an Apple Messages user wants to send a message, they just type their phone number into the To: field and send the message because Apple Messages incorporates SMS and OTT messaging.

73.    Apple prohibits third-party developers from incorporating other important features into their messaging apps as well. For example, third-party messaging apps cannot continue operating in the background when the app is closed, which impairs functionality like message delivery confirmation. And when users receive video calls, third-party messaging apps cannot access the iPhone camera to allow users to preview their appearance on video before answering a call. Apple Messages incorporates these features. If third-party messaging apps could incorporate these features, they would be more valuable and attractive to users, and the iPhone would be more valuable to Apple in the short term. For example, by incorporating SMS, users would avoid the hassle of convincing someone to download a separate app before sending them a message. Third-party messaging apps could also offer the ability to schedule SMS messages to be sent in the future, suggest replies, and support robust multi-device use on smartphones, tablets, and computers as they have already done on Android.

74.    Moreover, messaging apps benefit from significant network effects as more people use the app, there are more people to communicate with through the app, which makes the app more valuable and in turn attracts even more users. Incorporating SMS would help third party messaging apps grow their network and attract more users. Instead, Apple limits the reach of third-party messaging apps and reinforces network effects that benefit Apple.

75.     In addition to degrading the quality of third-party messaging apps, Apple affirmatively undermines the quality of rival smartphones .For example, if an iPhone user messages a non-iPhone user in Apple Messages the default messaging app on an iPhone then the text appears to the iPhone user as a green bubble and incorporates limited functionality :the conversation is not encrypted, videos are pixelated and grainy ,and users cannot edit messages or see typing indicators. This signals to users that rival smartphones are lower quality because the experience of messaging friends and family who do not own iPhones is worse- even though Apple, not the rival smartphone, is the cause of that degraded user experience. Many non-iPhone users also experience social stigma, exclusion, and blame for breaking chats where other participants own iPhones. This effect is particularly powerful for certain demographics, like teenagers where the iPhone's share is 85 percent, according to one survey. This social pressure reinforces switching costs and drives users to continue buying iPhones solidifying Apple's smartphone dominance not because Apple has made its smartphone better, but because it has made communicating with other smartphones worse.

76.     Apple recognizes that its conduct harms users and makes it more difficult to switch smartphones. For example, in 2013, Apple's Senior Vice President of Software Engineering reportedly explained that supporting cross-platform OTT messaging in Apple Messages "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." In March 2016, Apple's Senior Vice President of Worldwide Marketing forwarded an email to CEO Tim Cook making the same point: "moving iMessage to Android will hurt us more than help us."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**3. Apple restricts cross-platform digital wallets on the iPhone to create barriers to consumers to purchase competitors' smartphones.**

77.     Apple has blocked third-party developers from creating digital wallets on the iPhone with the important "tap-to-pay functionality." Apples uses its control over app creation and API access to selectively prohibit developers from accessing the Near-Field Communication ("NFC") hardware needed to provide tap-to-pay through a digital wallet app. Apple Wallet is the only app on the iPhone that can use NFC to facilitate tap-to pay.

78.     Cross-platform digital wallets would offer an easier, more seamless and secure way for users to switch from the iPhone to another smartphone. Many users already use apps created by their preferred financial institution. If these financial institutions offered digital wallets, then users would have access to new apps and technologies without needing to share their private financial data with additional third parties, including Apple. In the short term, these improved features would make the iPhone more attractive to users and profitable for Apple.

79.     The absence of cross-platform digital wallets with tap-to-pay capability on the iPhone makes it harder for iPhone purchasers to purchase a different smartphone.

80.     Apple uses its smartphone monopoly power to block banks and merchants to develop better payment products and services for iPhone users, while encouraging these same banks and merchants to participate in Apple Wallet.

81.     Apple uses its smartphone monopoly to extract payments from banks, which need to access customers to use digital wallets on iPhones. It has been reported that Apple has charged issuing banks 15 basis points (.15 percent) for each credit card transaction mediated by Apple Pay. Payment apps from Samsung and Google are free to issuing banks. Apple's fees are a significant

CLASS ACTION COMPLAINT

expense for issuing banks and cut into funding for features and benefits that banks might otherwise offer smartphone users.

82.    Multiple app developers have sought direct NFC access for their payment or wallet apps. Yet Apple prohibits these developers from incorporating tap to pay functionality in their apps for fear that it would threaten Apple Pay, leading to alternative payment apps that could operate cross-platform and undermine Apple's smartphone monopoly.

83.    Apple further impedes the adoption of third-party digital wallets by restricting others from offering the same ability to authenticate digital payment options on online checkout pages. By limiting the ability of third-party wallets to provide a simple fact and comprehensive solution to online purchasing, Apple further undermines the viability of such wallets and locks in consumers to continue to purchase iPhones.

84.    Apple creates barriers to cross-platform technologies to block iPhone users from leaving iPhones to use digital wallets on other platforms, and also block banks and merchants to create their own digital wallets in their apps to be allowed on the iPhone. Plaintiffs and the Class are locked into the iPhone, and then are charged supra-competitive price for the iPhone.

### 4. Apple protects its monopoly by impeding the development of cross-platform smartwatches.

85.    Apple uses smartwatches, a costly accessory, to prevent iPhone customers from choosing phones other than iPhones. Apple prevents third-party developers from innovating and limits the Apple Watch to the iPhone to bolster iPhone sales.

86.    Apple could compete with its smartphone competitors by creating a superior smartphone. Instead, it thwarts competition across the smartphone market by creating barriers for Apple smartwatches to connect with smartphones other than iPhones. Because of the significant cost of buying a smartwatch, users

are less willing to choose a smartphone if it's not compatible with their smartwatch.

87.    Apple's smartwatch—Apple Watch – is only compatible with the iPhone. So, if Apple can steer a user towards buying an Apple Watch, it becomes more costly for that user to purchase a different kind of smartphone because doing so requires the user to abandon their Apple Watch and purchase a new, Android compatible smartwatch.

88.    By contrast, cross-platform smartwatches can reduce iPhone user's dependence on Apple's proprietary hardware and software. If a user purchases a third-party smartwatch that is compatible with the iPhone and other smartphones, they can switch from the iPhone to another smartphone by simply downloading the companion app on their new phone and connecting to their smartwatch via Bluetooth. Moreover, as users interact with a smartwatch, users rely less on a smartphone's proprietary software and more on the smartwatch itself. This also makes it easier for users to switch from an iPhone to a different smartphone.

89.    Apple recognizes that driving users to purchase an Apple Watch, rather than a third-party cross-platform smartwatch, helps drive iPhone sales and reinforce the moat around its smartphone monopoly. For example, it has been reported that in a 2019 email the Vice President of Product Marketing for Apple Watch acknowledged that Apple Watch "may help prevent iPhone customers from switching." Surveys have reportedly reached similar conclusions: many users say the other devices linked to their iPhone are the reason they do not switch to Android.

90.    Apple uses its control of the iPhone, including its technical and contractual control of critical APIs, to degrade the functionality of third-party cross-platform smartwatches in at least three significant ways: First, Apple deprives iPhone users with third-party smartwatches of the ability to respond to

CLASS ACTION COMPLAINT

notifications. Second, Apple inhibits third-party smartwatches from maintaining a reliable connection with the iPhone. And third, Apple undermines the performance of third-party smartwatches that connect directly with a cellular network. In doing so, Apple constrains user choice and crushes innovation that might help fill in the moat around Apple's smartphone monopoly.

### 5. Apple creates barriers for iPhone users to purchase third party smartwatches.

91.    Apple also unlawfully ties Apple watches to its iPhones to arbitrarily restrict access to consumers purchasing alternative smart watches. The ability to respond to notifications, e.g., new messages or app alerts, directly from a smartwatch is one of the top considerations for smartwatch purchasers and one of the most used product features when it is available. It has been reported that, according to Apple's own market research, the ability to send and receive text messages from social and messaging apps is a critical feature for a smartwatch. In 2013, when Apple started offering users the ability to connect their iPhones with third-party smartwatches, Apple provided third-party smartwatch developers with access to various APIs related to the Apple Notification Center Service, Calendar, Contacts, and Geolocation. The following year, Apple introduced the Apple Watch and began limiting third party access to new and improved APIs for smartwatch functionality. For example, Apple prevents third-party smartwatches from accessing APIs related to more advanced Actionable Notifications, so iPhone users cannot respond to notifications using a third-party smartwatch. Instead, Apple provides third-party smartwatches access to more limited APIs that do not allow users to respond to a message, accept a calendar invite, or take other actions available on Apple Watch.

92.    A reliable Bluetooth connection is essential for a smartwatch to connect wirelessly with a smartphone, and thereby function as a companion to the user's smartphone and unlock its full functionality. But Apple prohibits third-

party smartwatch developers from maintaining a connection even if a user accidentally turns off Bluetooth in the iPhone's control center. Apple gives its own Apple Watch that functionality, however, because Apple recognizes that users frequently disable Bluetooth on their iPhone without realizing that doing so disconnects their watch. As a result, iPhone users have a worse experience when they try to use a third-party smartwatch with their iPhone. Apple also requires users to turn on Background App Refresh and disable the battery-saving Low Power Mode in their iPhone settings for third party smartwatches to remain consistently connected to their companion app, which is necessary to allow a user's iPhone and their smartwatch to update and share data about the weather or exercise tracking, even though Apple does not impose similar requirements for Apple Watch.

93.     Cellular-enabled smartwatches are popular with consumers. Apple Watch users use the same phone number for their smartphones and smartwatches when they connect to the cellular network. They have an integrated messaging experience – messages go to both their watches and phones. Although it is technically feasible for Apple to allow an iPhone user to connect with a third-party smartwatch in the same way, Apple requires these users to disable Apple's iMessage service on their iPhone to use the same phone number on a third-party smartwatch. This is a barrier for iPhone users to use third party smartwatches and drives iPhone users to purchase Apple Watches rather than third party smartwatches.

**6.  Apple uses a similar approach to maintain its monopoly through many other products and services.**

94.     The exclusionary and anticompetitive behaviors reported above are part of Apple's ongoing course of conduct to build and maintain a monopoly. It has been reported and alleged that Apple has deployed a similar playbook to prevent the development of cross-platform technologies.

95.     For example, it has been reported that Apple has undermined the ability of third-party location trackable devices to fully function across platforms.

96.     It has also been reported that Apple has impaired third-party cross-platform video communication apps while steering users to its own video communication app, Face Time.

## V.   ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS

97.     Apple's conduct has resulted in less choice for smartphone users. Today, only two companies (Google and Samsung) remain meaningful competitors to Apple in the premium smartphone market.

98.     Apple's conduct has delayed or suppressed the emergence of cross-platform technologies that would hinder Apple's ability to extract extraordinary profits from users and developers. For example, third-party digital wallets would reduce Apple's ability to charge banks high fees when users make payments using apple Wallet. Alternative digital wallets could also provide smartphone users better rewards as well as a more private, secure payment experience from a user's preferred financial institution rather than being forced to go through Apple. These tap-to-pay digital wallet products do not exist today because of Apple's anticompetitive conduct.

99.     This leaves all smartphone users worse off, with fewer choices, higher prices and fees, lower quality smartphones, apps, and accessories, and less innovation from Apple and others. It makes iPhone users worse off because they pay higher prices for a smartphone that has less innovation and features, including cross platform technologies described herein.

100.    Apple's conduct has made its own products worse, sacrificing the short-term profits Apple could earn from improving the iPhone to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of popular apps and accessories for iPhone users, which would in turn make iPhones more attractive

to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps, because of the threat they pose to Apple's smartphone monopoly. As a result, several developers have abandoned plans to develop super apps even after making substantial investments in bringing them to market.

101.   Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform smartwatches altogether. At least one company's canceled smartwatch formed part of its overall "wearables" strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

102.   Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, and less choice.

103.   Plaintiffs and Class Members purchased new iPhones from authorized retailers and/or carriers of Apple products. Because of the anticompetitive conduct alleged in this Complaint, Plaintiffs and Class members are forced to continue to purchase iPhones and are forced to pay more for those iPhones than they would have absent Apple's alleged monopolization conduct. Apple therefore has caused Plaintiffs and Class members to suffer overcharge damages. Without the unlawful restraints described above, Plaintiffs and Class Members would not have to pay supra-competitive price for performance smartphones and smartphones. Apple's anticompetitive practices also stalled or foreclosed competition and innovation in the performance smartphone and smartphone markets.

104.   Plaintiffs and Class Members in the Apple Watch Class have been forced to purchase Apple Watches to be compatible with their iPhones. The relevant market for the Apple Watch subclass is the smartwatch market for smartwatches that are compatible with Apple's smartphones and performance smartphones, i.e. iPhones. Apple coerces iOS consumers to use and purchase Apple Watches by foreclosing would-be rival smartwatches from connecting with the iPhone. By virtue of Apple's tying conduct, consumers' only smartwatch option to connect to the iPhone is Apple Watch. Plaintiffs and the Class are locked into purchasing Apple Watches by virtue of their existing purchase of iPhones and pay supra-competitive prices for the Apple Watch.

**VI.   SECURITY AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY APPLE'S ANTICOMPETITIVE CONDUCT**

105.   There are no valid procompetitive benefits of Apple's exclusionary conduct that would outweigh its anticompetitive effects. Apple's barrier-creating conduct against cross-platform technologies has not resulted in lower prices, higher output, improved innovation, or a better user experience for smartphone users.

106.   Apple markets itself based on privacy and security. But this does not justify Apple's monopolistic conduct. In fact, many alternative technologies that Apple's conduct suppresses would enhance user security and privacy. For example, Apple's conduct targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider or other trusted third party. When an iPhone user adds credit or debit card into Apple Wallet, Apple intervenes in the process that could otherwise occur directly between the user and card issuer introducing another point of failure for privacy and security.

107.   Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones, it has been reported, are unencrypted because of Apple's conduct. If Apple chose to, it could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would improve the privacy and security of iPhone and other smartphone users.

## VII.   MARKET DEFINITIONS– THE SMARTPHONE AND SMARTWATCH INDUSTRIES

### A.   Relevant Markets

108.   There are two relevant markets for the iPhone classes. The first relevant product market is the performance smartphone market. The performance smartphone market is a narrower market within the broader smartphone market. This narrower market includes those smartphones that compete with most iPhones and excludes lowest-end smartphones, which industry participants refer to as "entry-level" smartphones.

109.   Industry participants recognize performance smartphones as distinct and group these phones into the higher tiers such as "premium" or "flagship."

110.   The second relevant market is smartphones. Smartphones are different from phones that offer less capable hardware and software options than

smartphones. Smartphones are also distinct from other portable devices, such as tablets, smartwatches, and laptop computers.

111.   The relevant market for the Apple Watch Class is the smartwatch market for smartwatches that are compatible with Apple's iPhones.

**B.   Apple has Monopoly Power in the Relevant Markets**

112.   Apple has monopoly power in the smartphone and performance smartphone markets because it has the power to control prices or exclude competition in each of them. Apple also enjoys substantial and durable market shares in these markets. Moreover, Apple's market shares likely underestimate Apple's power because they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone. Apple's power will likely increase over time.

113.   In the U.S. market for performance smartphones, it has been reported that Apple estimates its market share exceeds 70 percent. These estimates likely understate Apple's market share today. For example, Apple's share among key demographics, including younger audiences and higher-income households, is even larger. Even in the broadest market consisting of all smartphones including many smartphones that Apple and industry participants do not view as competing with Apple's iPhones and other higher-end phones— Apple's share is more than 65 percent by revenue. Similarly, even if consumers choose one phone over another, most developers consider iPhones and Android devices as complements because developers must build apps that run on both platforms due to the lack of user multi-homing. In effect, the lack of multi-homing among users necessitates multi-homing among developers. This market reality increases the power that Apple can exercise over developers that seek to reach users on smartphones, especially performance smartphones, that run sophisticated apps.

114.    Apple's high market shares are durable. Over the last decade, Apple increased it share of smartphones sold in the United States most years. Through the same period, Apple collected more than half the revenue for all smartphones sold in the United States.

115.    Apple's monopoly power in the relevant markets is protected by substantial barriers to entry and expansion. For example, since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from using an iPhone to using another smartphone when they replace or upgrade their phone. As a result, switching costs--many created or exacerbated by Apple--impose substantial barriers to entry and expansion for rival smart phones. This barrier is increasingly impenetrable. It has been reported that nearly 90 percent of iPhone owners in the United States replace their iPhone with another iPhone. It has been alleged that at least one U.S. carrier estimates that as high as 98 percent of iPhone users on its network replace or upgrade their iPhone in a given quarter by buying another iPhone. The increased switching costs that consumers experience because of Apple's conduct underpins these exceedingly high retention rates.

116.    Apple's monopoly power in the relevant markets is protected by other barriers to entry, expansion, or repositioning as well. For example, introducing a new smartphone requires considerable investments in acquiring expensive and scarce components such as mobile chips and specialized glass for screens. Other significant barriers to entry include product design, software development, regulatory approval, manufacturing, marketing, and customer service.

117.    Because many smartphones are bought through mobile carriers, new entrants or those seeking to expand or reposition must meet the carriers technical requirements to access the major carrier networks in the United States. New entrants and smaller rivals must also negotiate distribution agreements and

persuade carriers and other retailers to promote their products to consumers. As explained above, rival smartphones must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone.

118.   Apple's iPhone platform is protected by several additional barriers to entry and expansion, including strong network and scale effects and high switching costs and frictions. For example, if an iPhone user wants to buy an Android smartphone, they are likely to face significant financial, technological, and behavioral obstacles to switching. The user may need to re-learn how to operate their smartphone using a new interface, transfer large amounts of data (e.g., contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These switching costs and frictions are even higher when software applications, and other functionality do not help the different devices and operating systems communicate and interoperate. These switching costs and frictions increase the stickiness of the iPhone, making users more beholden to the smartphone manufacturer and platform operator.

119.   Many prominent, well-financed companies have tried and failed to successfully enter the relevant markets because of these entry barriers. It has been reported that past failures include Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021). Today, only Samsung and Google remain as meaningful competitors in the U.S. performance smartphone market. It has been alleged that barriers are so high that Google is a distant third to Apple and Samsung even though Google controls development of the Android operating system.

CLASS ACTION COMPLAINT

120.   Apple's monopoly power is separately demonstrated by direct indicia. For example, Apple can and does profitably forego innovation without fear of losing customers to competitors.

121.   Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most consumers. Apple extracts fees from developers as much as 30 percent when users purchase apps or make in-app payments. Apple also extracts a 0.15 percent commission from banks on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will collect nearly $1billion in worldwide revenue on Apple Pay fees by 2025. A recent report by the U.S. Consumer Financial Protection Bureau suggests these revenues will only increase, as analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent by 2028.

122.   These indicia of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

## VIII.   TOLLING OF STATUTE OF LIMITATIONS

123.   Plaintiffs and Class members had no knowledge of Apple's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the Class period and continuing thereafter, until March 21, 2024, when the Department of Justice filed its Complaint and provided details concerning Apple and its conduct.

124. Plaintiffs and Class members suffered economic loss due to Apple's wrongful exercise of monopoly power. Plaintiffs' interactions with Apple were insufficient, however, to discover Apple's wrongful conduct.

125. Furthermore, very little public information was available during the Class period or thereafter that suggests Apple's business activities were done to monopolize the performance smartphone and smartphone market until the Department of Justice filed its antitrust complaint against Apple.

126. Moreover, it was reasonable for Plaintiffs and Class members not to suspect that Defendant was engaging in any unlawful anticompetitive behavior. Plaintiffs and class members are merely consumers of smartphones and performance smartphones were not active participants in the market.

127. Plaintiffs allege a continuing course of unlawful conduct by Apple, including conduct within the applicable limitation periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitation.

128. For these reasons, the statutes of limitations applicable to Plaintiffs' and Class members' claims have been tolled with respect to the claims asserted herein until the Department of Justice filed its antitrust complaint against Apple on March 21, 2024.

129. Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. Plaintiffs and Class members had no knowledge of Apple's wrongful acquisition and maintenance of monopoly power in the relevant markets, or of facts sufficient to place them on inquiry notice of their claims during the Class period and continuing thereafter. No information in the public domain or otherwise available to Plaintiffs and Class members during the Class period suggested that Apple had wrongfully acquired a monopoly or was using its monopoly power to charge supra-competitive prices.

130.   In failing to disclose its wrongful monopolization, in addition to denying it was engaged in such conduct, Apple was able to conceal its illicit conduct.

131.   Further, Apple's anticompetitive monopoly conduct was inherently self-concealing because, as Apple knew, its disclosure likely would have led to governmental enforcement activity or civil liability. Apple's conduct is subject to antitrust regulation, so it was reasonable for Plaintiffs and Class members to presume that it was purchasing smartphones and performance smartphones in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect that smartphones and performance smartphones were being sold at supra-competitive prices at any time during the Class period.

## IX.    CLASS ACTION ALLEGATIONS

132.   Plaintiffs bring this action individually and as class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Classes:

1. All persons and entities who, as residents of the United States and during the period of March 27, 2020 to the date of class notice, that purchased an iPhone ("Class Period");

2. All persons and entities who, as residents of the United States and during the period of March 27, 2020 to the date of class notice, that purchased an iPhone performance smartphone; and

3. All persons and entities who, as residents of the United States and during the period of March 27, 2020 to the date of class notice, purchased any Apple Watch ("Apple Watch class").

133.   Collectively, these Classes will be referred to as "the Class."

134.   Plaintiffs also bring this action individually and as a California class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

1    1. All persons and entities, who as residents of California, and during
2       the period of March 27, 2020 to the date of class notice, that
3       purchased an iPhone;
4    2. All persons and entities, who as residents of California, and during
5       the period of March 27, 2020 to the date of class notice, that
6       purchased an iPhone performance smartphone; and
7    3. All persons and entities, who as residents of California, and during
8       the period of March 27, 2020 to the date of class notice, that
9       purchased any Apple Watch.

10   135.   These definitions specifically exclude the Defendant named herein,
11  any of the Defendant's parent companies, subsidiaries, and affiliates, and any of
12  the Defendant's officers, directors, management, employees, subsidiaries,
13  affiliates, or agents. Plaintiffs reserve the right to expand, modify, or alter the
14  class definition in response to information learned during discovery.

15   136.   This action is properly brought as a class action under Federal Rule of
16  Civil Procedure 23(a) for the following reasons:

17   1. Numerosity (Fed. R. Civ. P. 23(a)(1)): The proposed Class is so
18      numerous and geographically dispersed that the joinder of all
19      Class Members is impracticable. While Plaintiffs do not know the
20      exact number and identity of all Class Members, Plaintiffs are
21      informed and believe that there are millions of Class Members. The
22      precise number of Class Members can be ascertained through
23      discovery;
24   2. Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and
25      23(b)(3)): There are questions of law and fact common to the
26      proposed classes which predominate over any questions that may

affect particular Class Members. Such common questions of law and fact include, but are not limited to:

i.      Whether Defendant monopolized the market for smartphones, performance smartphones, or smartwatches;

ii.     Whether Apple unlawfully acquired and maintained monopoly power in the relevant markets;

iii.    Whether Plaintiffs and the other members of the Class were injured by Defendant's conduct and, if so, the determination of the appropriate Class-wide measure of damages;

iv.     Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

v.      Whether the alleged conspiracy violated the Sherman Act;

vi.     Whether the alleged conspiracy violated California's antitrust and unfair competition laws; and

vii.    Whether Defendant unjustly enriched itself to the detriment of the Plaintiffs and the members of the Class, thereby entitling Plaintiffs and the members of the Class to disgorgement of all benefits derived by Defendant.

3. Typicality (Fed. R. Civ. P. 23(a)(3)): Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and the Class have been injured by the same wrongful practices of Defendant. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the Class and are based on the same legal theories;

4. Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)): Plaintiffs will fairly and adequately protect the interests of the Class in that they have  no interests antagonistic to those of the other members of the

Class, and Plaintiffs have retained attorneys experienced in antitrust class actions and complex litigation as counsel;

137.   This action is properly brought as a class action under Federal Rule of Civil Procedure 23(b) for the following reasons:

1.   Declaratory and Injunctive Relief (Fed. R. C. P. 23(b)(2)): Certification under Rule 23(b)(2) is warranted because Defendant acted or refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

2.   Superiority (Fed. R. Civ. P. 23(b)(3)): Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

3.   The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion;

138.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

1.   Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them and absent Class Members

have no substantial interest in individually controlling the prosecution of individual actions;

2. This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

3. Without a class action, Class Members will suffer damages, and Defendant's violations of law will proceed without remedy while Defendant reaped and retained the substantial proceeds of its wrongful conduct; and

4. Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## X.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of Sherman Act -- Monopolization

### (15 U.S.C. § 2)

### (Performance Smartphone Class)

139.   Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

140.   Plaintiffs bring this claim on their own behalf of each member of the Performance Smartphone Class described above.

141.   The relevant market is the U.S. market for performance smartphones, and Apple has monopoly power in that market.

142.   Apple has gained and maintains monopoly power in the relevant market by improper and unlawful means. More specifically, Apple has willfully acquired and maintained such power through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions

individually and collectively increased, maintained, or protected its performance smartphone monopoly.

143.   Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud stream, messaging, wearables and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

144.   While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts have had harmful effects on competition and the performance smartphone class.

145.   Apple's exclusionary conduct lacks a pro-competitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

146.   For the reasons stated herein, substantial barriers to entry exist in the relevant market.

147.   Apple has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

148.   Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival competitors in the U.S. market for performance smartphone purchases.

149.   Apple has behaved as alleged herein to obtain a monopoly in the U.S. market for performance smartphone purchases, with the effect being that

competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Further, Apple's actions have depressed output and stifled innovation and options for the classes as alleged herein.

150.   There is no business necessity or other pro-competitive justification for Apple's conduct.

151.   As a direct and proximate cause of Apple's conduct, Plaintiffs and members of the Class have suffered antitrust injury. Plaintiffs and the Class members paid significantly higher prices for performance smartphone purchases than they would have but for Apple's unlawful conduct. That conduct also deprived Plaintiffs and Class members of improved quality and innovation in the relevant markets.

152.   Plaintiffs and members of the Class are entitled to damages, including treble damages, sustained because of Apple's monopolistic acts and practices.

153.   Plaintiffs and members of the Class are entitled to equitable relief as appropriate to cure Apple's monopoly conduct and restore competition in the relevant markets. Members of the Class are regular users in the performance smartphone market, the smartphone market and the smartwatch market and will continue to purchase such devices and suffer further injury if Apple's monopoly is not ended.

154.   Plaintiffs and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to charge supra-competitive prices for performance smartphone, smartphone and smart watch prices. See, e.g., 15 U.S.C. § 26.

## SECOND CAUSE OF ACTION

### Violation of Sherman Act – Attempted Monopolization

### (15 U.S.C. § 2)

### (Performance Smartphone Class)

155.   Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

156.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

157.   The relevant market is the U.S. market for performance smartphones.

158.   Apple has attempted to monopolize the U.S. performance smartphone market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market

159.   Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

160.   While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

161.   Apple's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for performance smartphones.

162.   Apple has a specific intent to achieve monopoly power in the U.S. market for smartphones. Now, and if its unlawful restraints are not checked, Apple has a dangerous probably of success in the relevant market as defined by the Plaintiffs.

163.   Apple has behaved as alleged herein in an attempt to obtain a monopoly in the performance smartphone market, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Additionally, Apple has abused its market power by charging supra-competitive sales of performance smartphones, and making rival companies' performance smartphones operate more poorly in hindering cross-platform technologies. Further, Apples's actions have depressed output and stifled innovation and options for the Class as alleged herein.

164.   There is no business necessity or other pro-competitive justification for Apple's conduct.

165.   Plaintiffs and the Class have been injured, and will continue to be injured, in their property as a result of Apple's conduct, including by way of overpaying for performance smartphones.

166.   Plaintiffs are inclined to continue to purchase Apple performance smartphones in the future because of their investment in the Apple platform and the barriers that exist in changing to a rival performance smartphone.

167.   Plaintiffs and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to charge supra-competitive commission on sales of performance smartphones. See, e.g., 15 U.S.C. § 26.

### THIRD CAUSE OF ACTION

### Violation of Sherman Act -- Monopolization

### (15 U.S.C. § 2)

### (Smartphone Class)

168.   Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

169.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Smartphone Class described above.

170.    The relevant market is the U.S. market for smartphones, and Apple has monopoly power in that market.

171.    Apple has gained and maintains monopoly power in the relevant market by improper and unlawful means. More specifically, Apple has willfully acquired and maintained such power through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its smartphone monopoly.

172.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud stream, messaging, wearables and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

173.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts have had harmful effects on competition and the smartphone class.

174.    Apple's exclusionary conduct lacks a pro-competitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

175.    For the reasons stated herein, substantial barriers to entry exist in the relevant market.

CLASS ACTION COMPLAINT

176.   Apple has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

177.   Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival competitors in the U.S. market for smartphone purchases.

178.   Apple has behaved as alleged herein to obtain a monopoly in the U.S. market for smartphone purchases, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Further, Apple's actions have depressed output and stifled innovation and options for the Class as alleged herein.

179.   There is no business necessity or other pro-competitive justification for Apple's conduct.

180.   As a direct and proximate cause of Apple's conduct, Plaintiffs and members of the Class have suffered antitrust injury. Plaintiffs and the Class members paid significantly higher prices for smartphone purchases than they would have but for Apple's unlawful conduct. That conduct also deprived Plaintiffs and Class members of improved quality and innovation in the relevant market.

181.   Plaintiffs and members of the Class are entitled to damages, including treble damages, sustained because of Apple's monopolistic acts and practices.

182.   Plaintiffs and members of the Class are entitled to equitable relief as appropriate to cure Apple's monopoly conduct and restore competition in the relevant market. Members of the Class are regular users in the smartphone market and will continue to purchase such smartphones and suffer further injury if Apple's monopoly is not ended.

183.   Plaintiffs and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to charge supra-competitive prices for smartphones. See, e.g., 15 U.S.C. § 26.

**FOURTH CAUSE OF ACTION**

**Violation of Sherman Act – Attempted Monopolization**

**(15 U.S.C. § 2)**

**(Smartphone Class)**

184.   Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

185.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

186.   The relevant market is the U.S. market for smartphones.

187.   Apple has attempted to monopolize the U.S. smartphone market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

188.   Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables and digital wallets .The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

189.   While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

190.   Apple's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for smartphones.

191.   Apple has a specific intent to achieve monopoly power in the U.S. market for smartphones. Now, and if its unlawful restraints are not checked, Apple has a dangerous probability of success in the relevant market as defined by the Plaintiffs.

192.   Apple has behaved as alleged herein to obtain a monopoly in the smartphone market, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Additionally, Apple has abused its market power by charging supra-competitive prices on sales of smartphones, and making rival companies' smartphones operate more poorly in hindering cross-platform technologies. Further, Apples's actions have depressed output and stifled innovation and options for the Class as alleged herein.

193.   There is no business necessity or other pro-competitive justification for Apple's conduct.

194.   Plaintiffs and the Class have been injured, and will continue to be injured, in their property as a result of Apple's conduct, including by way of overpaying for smartphones.

195.   Plaintiffs are inclined to continue to purchase Apple smartphones in the future because of their investment in the Apple platform and the barriers that exist in changing to a rival smartphone.

196.   Plaintiffs and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from

continuing to charge supra-competitive commission on sales of smartphones. See, e.g., 15 U.S.C. § 26.

**FIFTH CAUSE OF ACTION**

**Violation of Sherman Act –Tying**

**(15 U.S.C. §§ 1,3)**

**(Apple Watch Class)**

197.   Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

198.   Apple has unlawfully tied Apple Watch to its mobile devices, namely the iPhone.

199.   As demonstrated above, the Apple Watch is a product in the market of smartwatches compatible to Apple iPhones. This market is distinct from the relevant market from Apple's smartphone and performance smartphone markets. Apple's unlawful tying arrangement thus ties two separate products and that are separate markets.

200.   Apple exercise market power in the smartphone and performance smartphone markets (collectively called iPhone).

201.   Apple coerces iOS consumers to use and purchase Apple Watches by foreclosing would-be rival smartwatches from connecting with the iPhone. By virtue of Apple's tying conduct, consumers' only smartwatch option to connect to the iPhone is Apple Watch.

202.   Apple's conduct forecloses competition in the market for smartwatches compatible with Apple iPhones. Given the value and transactions and the money at issue, Apple's conduct affects a substantial violation of commerce in that market.

203.   Apple has thus engaged in a per se illegal tying arrangement.

204.   In the alternative only, even if Apple's tying conduct does not constitute a per se violation of the law, the rule of reason analysis of Apple's tying arrangement also would demonstrate that it violates the law.

205.   There is no valid business necessity or pro-competitive justification for Apple's tying conduct.

206.   Plaintiffs and the Apple Watch Class have been injured, and will continue to be injured, in their business and property as a result of Apple's conduct, including by overpaying for smartwatches for Apple's iPhones.

207.   Plaintiffs and members of the putative class have suffered and continue to suffer damages and irreparable injury, including ongoing harm to their business, and such damages and injury will not abate until the Court issues an injunction ending Apple's anticompetitive issues.

**SIXTH CAUSE OF ACTION**

**Violation of the California Unfair Competition Law**

**(Cal. Business and Professions Code § 17200, et seq.)**

**Unlawful and Unfair Prongs**

**(Limited to California iPhone and Apple Watch Subclasses)**

208.   Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

209.   Apple's conduct is unlawful in violation of California's Unfair Competition Law ("UCL") because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2 (monopolization), and 15 U.S.C. §§ 1,3 (tying).

210.   Apple has engaged in unfair business practices through the conduct alleged herein, which has restrained competition. Apple's conduct is unfair and in violation of the UCL because it violates California's clearly established public policy forbidding monopolistic acts. Apple wrongfully acquired and unlawfully maintained monopoly power in the relevant markets through the conduct alleged herein.

211.   Apple's practices also are unlawful in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including in the form of artificially inflated prices, that greatly outweighs any possible utility from the practices.

212.   Apple's conduct is unfair in violation of California's Unfair Competition Law because it deprives consumers of innovation in technology and encourages substandard products in the relevant markets by Apple's competitors. Apple's conduct is unfair because it provides barriers that prevent consumers from more seamless cross-platform technology. Apple's conduct is also unfair because it violates the policy and spirit of the antitrust laws to prevent monopolistic behavior that hinders consumers choice and promotes supra-competitive prices.

213.   Apple's conduct actually and proximately caused Plaintiffs and Class members to lose money or property. On behalf of the Class, Plaintiffs seek damages, injunctive relief, and reasonable attorneys' fees and costs, as well as any other relief the Court may deem just or proper.

214.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and Class members seek from Defendant restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Defendant for its violations of the UCL.

215.   Plaintiffs and the Class remain at risk of future harm and injury unless the challenged practices, described above, are modified and enjoined. Pursuant to Cal. Bus. & Prof. Code § 17203, on behalf of the Class, Plaintiffs seek an injunction prohibiting Defendant from continuing its unlawful practices.

216.   Plaintiffs, on behalf of the general public of the State of California and pursuant to id. § 17203 and *McGill v. Citibank*, N.A., 393 P.3d 85 (Cal. 2017), seek a court order for public declaratory and injunctive relief to enjoin Defendant from

such future misconduct, and any other such order that may be necessary to prevent future harm and financial injury to members of the general public who have not yet transacted with Defendant but are likely to in the future. As set forth above, the general public is in need of protection from Defendant's ongoing and continuing violations of the UCL. Such relief will create a public benefit. Plaintiffs thus bring this action for public declaratory and public injunctive relief as a private attorney general and to vindicate and enforce important rights affecting the public interest. Plaintiffs are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 for bringing this action for public declaratory and injunctive relief.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

1. That the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4) that Plaintiffs be certified as Class representative, and Plaintiffs' counsel be appointed as counsel for the Class;

2. That the unlawful contract, combination, or conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act;

3. That Defendant has violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

4. That Plaintiffs and the Class have been injured in their business and property as a result of Defendant' violations;

5. That Plaintiffs and the Class recover damages, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendant on behalf of Plaintiffs and the Class;

6.     Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, costs, and expenses of the lawsuit, as provided by law;

7.     That Defendant, its subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on its  behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

8.     That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

9.     That Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendant's past and ongoing restraint of trade, including:

   a) A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendant; and

   b) Issuance of a permanent injunction against Defendant and their parents, subsidiaries, affiliates, successors, transferees, assignees and the Respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

   c) That Defendant are to be jointly and severally responsible financially for the costs and expenses of a Court-approved notice program through post and media designed to give immediate notification to the Class; and

   d)  For such other and further relief as is just under the circumstances.

1

## XI.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs and the Class demand a trial by jury of all the claims asserted in this complaint that are so triable.

Dated: April 12, 2024          Respectfully submitted,

By:    */s/ Gayle M. Blatt*
GAYLE M. BLATT
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD, LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232
*dcasey@cglaw.com*
*gmb@cglaw.com*
*jrobinson@cglaw.com*
*camille@cglaw.com*
*hbruno@cglaw.com*

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT